UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALLIED INDUSTRIAL SCRAP, INC., | ) ) | CASE NO. 4:10CV2092 |
| Plaintiff | ) ) | JUDGE JOHN R. ADAMS |
| v. | ) ) | |
| OMNISOURCE CORPORATION, | ) ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant | | |

This matter appears before the Court on Plaintiff Allied Industrial Scrap, Inc.'s ("Allied") Motion for Summary Judgment (Doc. 62) and Defendant OmniSource Corporation's ("OmniSource") Motion for Partial Summary Judgment (Doc. 56). For the following reasons, Allied's motion is GRANTED IN PART AND DENIED IN PART, and OmniSource's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART.

 **I.** **Factual Background and Procedural History**

The substantive facts giving rise to this matter are largely undisputed by the parties. Allied and OmniSource are both in the same industry --- they are purchasers, processors, graders and sellers of ferrous and non-ferrous scrap metal. On July 21, 2010, the parties entered into a contract ("the Contract") under which OmniSource would purchase approximately 3,000,000 pounds of scrap copper wire from Allied.

The Contract obligated OmniSource to purchase four different grades of scrap copper wire: Insulated Copper Wire ("Item A"); Insulated Heavy Gauge Tinned Copper Wire ("Item B"); Insulated Bare Copper Wire ("Item C"); and Bare Copper Wire ("Item D"). A formula in the Contract set the price of the copper by referencing the market price of the scrap copper, the

1

weight of the copper shipped by Allied, a guaranteed minimum percentage of recovery for each grade, and a processing cost. The "guaranteed minimum recovery percentages" for each type of copper were listed as follows: 62.5% for "Item A," 82.5% for "Item B," 87.5% for "Item C," and 100% for "Item D." Allied shipped OmniSource numerous loads of all four categories between July and August of 2010.

The Contract required OmniSource to notify Allied within 96 hours of any rejection of non-conforming goods. The Contract also provided that any "negative variance" from the guaranteed minimum recovery must be resolved "between John R. Ramun [for Allied] and Chad Frederick [for OmniSource] after Chad submits valid justification causing such variance to John." The Contract further included the following provision:

> IN ALL OTHER RESPECTS THE MATERIAL IS SOLD ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, ALLIED INDUSTRIAL SCRAP INC. MAKES NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Doc. 56-3 at 2. This provision was contained in the same paragraph that purported to prohibit recovery of any incidental or consequential damages.

Despite the apparently simple contract, disputes between the parties quickly arose. For example, Allied alleges that it shipped 1,306,080 pounds of "Item A" to OmniSource, while OmniSource contends that its scales showed only 1,300,000 pounds of "Item A." The parties further dispute whether the quality of the copper conformed to the terms of the Contract or whether reductions were warranted for foreign substances contained in the copper. Instead of calculating payment pursuant to the "guaranteed minimums" set forth in the Contract, OmniSource sought to calculate its payments using 53% for "Item A," 75.02% for "Item B," and 77% on "Item C." OmniSource claimed that these reductions were warranted because actual

recoveries were lower due to rocks, dirt, and other debris being present in the copper scrap. OmniSource attempted to negotiate this lower payment price, but Allied refused to negotiate with OmniSource and instead asserted that the "guaranteed minimums" governed the price.

OmniSource admits that it accepted and processed the copper in spite of these alleged deficiencies, but also contends that it promptly notified Allied of all these issues. OmniSource asserts that Allied, through its agent,[1] made no effort to remedy the situation as required by the Contract. Thereafter, OmniSource suspended its performance under the contract, and Allied initiated this action.

On September 20, 2010, Allied filed the instant complaint, alleging underpayment for the copper scrap and therefore breach of contract. On October 28, 2010, OmniSource answered and filed a five-count counterclaim asserting breach of contract regarding weight discrepancies, loss of spread, overpayment, foreign material, and negligence. On December 7, 2010, OmniSource filed an amended counterclaim asserting the same five claims against Allied. On December 28, 2010, Allied answered the amended counterclaim and asserted numerous affirmative defenses. On November 14, 2011, OmniSource filed its Motion for Partial Summary Judgment, seeking judgment related to the price provision of the Contract and seeking to invalidate the attorney fees provision therein. On that same day, Allied filed its Motion for Summary Judgment on OmniSource's amended counterclaim and its claim for breach of contract. The matter is now ripe for review.

**II.     Law and Analysis**

    A. <u>**Summary Judgment Standard**</u>

---

[1] Any weight or price disagreements were to be resolved between John Ramun and Chad Frederick, the Copper and Brass Sales Manager of OmniSource, as set forth in the Schedule A pricing format and under Remarks on the Sales Confirmation page. Doc. 56-3 at 3.

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(a). The initial burden of showing the absence of any "genuine issues" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed.R. Civ.P. 56(c)).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. (quoting former Fed.R. Civ.P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary burdens.  *Id*. at 252.  Moreover, the Court must view a summary judgment motion "in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-moving party. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Kentucky Dep't of Transp*., 53 F.3d 146, 150 (6th Cir. 1995).  Moreover, Fed.R. Civ.P. 56(e) states as follows:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> …
>
> (2) consider the fact undisputed for purposes of the motion; [or]
>
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it[.]

4

Accordingly, summary judgment analysis asks whether a trial is necessary and therefore is appropriate when there are no genuine issues of fact. *Anderson,* 477 U.S. at 250.

### B. Count I- Breach of Contract Regarding Weight Discrepancies

The damages sought by OmniSource in Count I of the Amended Counterclaim stem from the "sale and processing of the material purchased from Allied." The alleged loss was a result of the delay and hedging transactions OmniSource entered into with third parties. As the price of copper increased during the delay, OmniSource could not take advantage of this price increase and claims damages therefrom. In the Sixth Circuit, "lost profits are generally not considered direct damages," but instead are consequential damages. *Airlink Communications, Inc. v. Owl Wireless, LLC,* 2011 WL 4376123, at *3 (6th Cir. Sept. 20, 2011) (citing *Mead Corp. v. McNally-Pittsburgh Mfg. Corp.*, 654 F.2d 1197, 1209 n. 17 (6th Cir. 1981)). "Furthermore, when damages claimed by a plaintiff are contingent on collateral third-party agreements—as is the case here—those damages are consequential, not direct." *Airlink,* 2011 WL 4376123 at *3.

The Contract's "General Terms and Conditions" state that **"in no event shall Allied be liable to the Buyer for incidental, consequential or special damages including claims for lost profits or loss of use."** Doc. 56-3 at 2. No apparent ambiguity exists in the language of the Contract; it appears clear that Allied is solely liable for direct damages. However, OmniSource contends that the above provision is both ambiguous and unenforceable. The Court finds no merit in either argument.

First, OmniSource contends that the language at issue is ambiguous because of the context in which it appears. The full sentence that purports to limit damages reads: "Buyer assumes all risks of patent infringement by reason of any use Buyer makes of the material alone or in combination with other material or in the operation of any process, in no event shall Allied

5

[be] liable to the Buyer for incidental, consequential or special damages including claims for lost profits or loss of use." OmniSource contends that the reference to patent infringement makes it, at best, ambiguous as to the intent of the provision. However, the plain language of the second clause indicates that "**in no event**" shall be consequential damages be available. Thus, there exists no ambiguity regarding the scope of the limitation on damages. OmniSource's contention that the provision is ambiguous is rejected.

OmniSource next argues that the provision is unenforceable as a matter of law because it is not conspicuous as required under Ohio law. In that regard, the Ohio Supreme Court has discussed the issue as follows:

> The limitation (or exclusion of remedies) must be a part of the parties' bargain in fact. If it is contained in a printed clause which was not conspicuous or brought to the buyer's attention, the seller had no reasonable expectation that the buyer understood that his remedies were being restricted to repair and replacement. As such, the clause cannot be said to be a part of the bargain (or agreement) of the parties.

*Ins. Co. of N.A. v. Automatic Sprinkler Corp.*, 67 Ohio St.2d 91, 96-97 (1981). In response, Allied contends that the record amply demonstrates the provision was a part of the parties' bargain. The Court agrees.

> In his deposition, Chad Frederick, the sales manager for Allied, was asked as follows:
>
> In entering into this contract, and in reading these terms and conditions, did you have an understanding that OmniSource would not be permitted to seek damages from Allied for any costs that OmniSource believed that, any extra costs that OmniSource believed it incurred in running nonconforming material? Did you understand you would not be able to obtain damages from Allied?

Doc. 65 at 49. Frederick responded to that inquiry as follows:

> Did I understand that when I went into the agreement? I mean, I read the contract, so yes. I mean, once again, there, there wasn't – okay. Yes.

Doc. 65 at 49. Therefore, regardless of whether the clause is conspicuous as defined under Ohio

6

law, the record is clear that OmniSource was aware of the provision and agreed to it when it executed the contract. Accordingly, the provision was a part of the parties' bargain and the Court finds no grounds to set aside the provision. Summary judgment in favor of Allied on count I of OmniSource's counterclaim is therefore appropriate.

### C. Count II- Breach of Contract Regarding Copper Recoveries-Loss of Spread

Similarly, count II of the counterclaim seeks consequential damages directly tied to the delay caused by Allied's alleged breach. As discussed above, any such recovery is barred by the express terms of the Contract. As such, summary judgment in favor of Allied on count II of the counterclaim is also appropriate.

### D. Count III- Breach of Contract Regarding Copper Recoveries- Overpayment

Allied's motion makes no mention of count III of the counterclaim. Accordingly, the Court has no reason to examine this count.

### E. Count IV- Breach of Contract Regarding Foreign Material

In count IV of the counterclaim, OmniSource seeks damages related to additional processing costs it claims were incurred when Allied shipped loads that included foreign material such as rocks, dirt, lead, and stainless wrap. Allied contends that it is entitled to judgment on this count because the Contract provided that the material was sold "as is" thereby barring any claim premised upon an implied warranty. The Court finds no merit in this contention.

"The role of courts in examining contracts is to ascertain the intent of the parties." *Savedoff v. Access Group, Inc.,* 524 F.3d 754, 763 (6th Cir. 2008), (citing *City of St. Marys v. Auglaize Cty. Bd. of Commrs.,* 875 N.E.2d 561, 566 (Ohio 2007). Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 652 N.E.2d 684, 686 (Ohio 1995).

7

The provision relied upon by Allied provides as follows: "All scrap purchased is on an 'as is' basis." Doc. 56-3 at 1. The Contract goes on to state:

> IN ALL OTHER RESPECTS THE MATERIAL IS SOLD ON AN 'AS IS,' 'WHERE IS,' 'WITH ALL FAULTS' BASIS, ALLIED INDUSTRIAL SCRAP INC. MAKES NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Doc. 56—3 at 2 (all caps in original). Allied contends that these provisions eliminate any ability of OmniSource to claim damages based upon increased processing costs. This contention, however, is unsupported by the plain language of the Contract.

Pursuant to the plain language of the Contract, OmniSource agreed to purchase insulated copper wire, insulated heavy gauge tinned copper wire, insulated bare copper wire, and bare copper wire. Allied is correct that the Contract bars any claim by OmniSource for damages based on an assertion that the quality of the copper did not meet the specifications agreed upon by the parties. However, OmniSource raises no such claim. Instead, OmniSource claims that it contracted to purchase a particular amount and type of **copper.** OmniSource goes on to allege that instead of receiving that amount of cooper, it received a lesser amount and numerous foreign substances that were not a part of the parties contract. The Court agrees that the plain language of the contract bars any claim surrounding the quality of the copper. However, the "as is" clause does not give Allied carte blanche to provide *anything* to OmniSource and then demand payment as if it solely provided copper. Accordingly, summary judgment in favor of Allied is not warranted based upon this argument.

Similarly, the Court rejects Allied's argument that damages are precluded on this claim because OmniSource was limited to seeking replacement copper. Again, this argument is based upon the faulty premise that OmniSource is challenging the quality of the copper. The claim

8

clearly asserts a challenge not to the quality of the copper, but to that fact that other items were included with the copper that hindered processing. Accordingly, there is nothing to replace because no copper was ever rejected by OmniSource. Count IV, therefore, remains for a jury to consider.

### F. Count V- Claim for Negligence

Count V of the amended counterclaim alleges that Allied damaged the truck of third party, Frank Kirby Trucking Co., leading to damages in the amount of $6500. OmniSource had hired Frank Kirby Trucking to transport some of the copper wire. Allied allegedly damaged a dump trailer owned by Frank Kirby Trucking Co. while it was being loaded at Allied's facility. Allied claims that OmniSource lacks standing to pursue this claim. The Court agrees.

OmniSource contends that the doctrine of equitable subrogation grants it standing to pursue this claim on behalf of Frank Kirby Trucking. The Sixth Circuit has explained the doctrine of equitable subrogation as follows:

> The requirements of equitable subrogation were long ago stated by the U.S. Supreme Court. Firstly, the party seeking equitable subrogation "must have paid a debt due to a third party before he can be substituted to that party's rights." *Prairie State Bank v. United States*, 164 U.S. 227, 231 (1896) (quotation and citation omitted). Secondly, in paying the debt, "he must not act as a mere volunteer, but on compulsion, to save himself from loss by reason of a superior lien or claim on the part of the person to whom he pays the debt ...." *Id.* The right to equitable subrogation is "never accorded in equity to one who is a mere volunteer in paying a debt of one person to another." *Id.* "To avoid being a mere volunteer, the party seeking subrogation must have made payment in order to fulfill a legal or equitable duty owed to the subrogor." *In re Lewis*, 398 F.3d at 747.
>
> A "volunteer" has been defined as "one who intrudes himself into a matter which does not concern him, or one who pays the debt of another without request, when he is not legally or morally bound to do so, and when he has no interest to protect in making such payment." *Detroit Auto. Inter-Ins. Exch. v. Detroit Mut. Auto. Ins. Co.*, 337 Mich. 50, 53-54 (1953) (quotation and citation omitted). Further, a "payment is not voluntary when made under compulsion, under a moral obligation, *in ignorance of the real state of facts*, or *under an erroneous*

9

*impression of one's legal duty.*" *Id.* at 54 (quotation and citation omitted) (emphasis added).

*Fed. Ins. Co. v. Hartford Steam Boiler Inspection and Ins. Co.*, 415 F.3d 487, 494 (6th Cir. 2005) (all emphasis in original).

In the instant matter, OmniSource has failed to demonstrate that it is anything other than a volunteer. Within its counterclaim, OmniSource contends that it paid the trucking company out of a contractual obligation. However, in motion practice, OmniSource presented no evidence that it was legally or morally bound to pay the damage to the truck. Instead, OmniSource relies solely upon the fact that it paid for the damage to support its standing. Absent evidence that OmniSource was somehow required, legally or morally, to pay for the damage, standing has not been established. Accordingly, Allied is entitled to summary judgment on count V of the counterclaim.

G. **Attorney Fees**

Allied asks the Court to declare as a matter of law that OmniSource must pay its attorney fees, and OmniSource asks the Court to declare as a matter of law that the attorney fees provision is invalid. As a general rule, attorney fees are not ordinarily recoverable in the absence of a statute or enforceable contract provision. *Nottingdale Homeowners' Ass'n, Inc. v. Darby,* 514 N.E.2d 702, 704 (Ohio 1987). At one time, Ohio law viewed one-sided attorney fee provisions, such as the one at issue herein, as unenforceable.

> [T]he attorney's fee provision is clearly unenforceable, because it operates as a penalty against appellee and encourages litigation. Specifically, because the attorney's fee provision only requires appellee to pay appellant's attorney's fees in case of breach while requiring nothing from appellant in the event of its breach of the contract, the provision obviously works as a penalty, and its one-sided, appellant-favored nature promotes litigation.

*K&A Cleaning, Inc. v. Materni*, 2006 WL 1047477 (Ohio Ct. App. Apr. 21, 2006). However,

more recent cases from Ohio law have distanced themselves from such a view:

> In [*Worth v. Aetna Cas. & Sur. Co.*, 32 Ohio St.3d 238, 242-43 (1987)], the Supreme Court of Ohio explained the theory behind the unenforceability of the type of contract involved in *K & A Cleaning*: "When a stipulation to pay attorney fees is incorporated into an ordinary contract, lease, note or other debt instrument, it is ordinarily included by the creditor or a similar party to whom a debt is owed and is in the sole interest of such party. In the event of a breach or other default on the underlying obligation, the stipulation to pay attorney fees operates as a penalty to the defaulting party and encourages litigation to establish either a breach of the agreement or a default on the obligation. In those circumstances, the promise to pay counsel fees is not arrived at through free and understanding negotiation." In contrast, the indemnity provision which included the payment of attorney fees that the court approved of in *Worth* was freely negotiated by sophisticated businessmen and "the indemnitor's alleged wrongful refusal to honor its obligations caused the indemnitee to incur legal expenses in order to vindicate its right to indemnity." *Id.* at 242. Following *Worth*, it has been held that "attorney fee provisions are enforceable in situations where there are equal bargaining positions, the parties are of similar sophistication, and both parties had the opportunity to obtain counsel to review the provision and negotiate its terms." *First Capital Corp. v. G & J Industries, Inc.*, 131 Ohio App.3d 106, 113 (1999).

*Norfolk S. Ry. Co. v. Toledo Edison Co.*, 2008 WL 853531, at *11 (Ohio Ct. App. Mar. 31, 2008).  While the above-quoted provision would suggest that the fee provision is enforceable, Sixth Circuit precedent compels a different conclusion:

> In an unpublished 1998 opinion, this court held that Ohio law precludes contractual recovery of attorney fees without specific negotiation. *Colonel's Inc. v. Cincinnati Milacron Mktg. Co.*, Nos. 96-1243, 96-1244, 1998 WL 321061, at *5 (6th Cir. June 1, 1998). In a published 2005 opinion, we reaffirmed that conclusion. *Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781, 792 (6th Cir. 2005).

*Big Lots Stores, Inc. v. Luv N'Care, Ltd.*, 302 Fed. Appx. 423, 426 (6th Cir. 2008).  *Big Lots Stores* went on to explain that Ohio law has moved away from hostility towards these types of attorney fee provisions.  *Id.* at 427-28 (analyzing Ohio cases).  Ultimately, however, *Big Lots Stores* concluded:

> Although these cases may be some indication of a shift in the law from the situation at the time of *Scotts*, they are not sufficient for us to depart from the *Scotts* holding. They are not that different from pre- *Scotts* Ohio appellate cases.

11

>And they do not deal with the type of battle-of-the-forms situation presented in this case. Without a clearer signal from the Ohio courts, we adhere to our holdings in *Scotts* and *Colonel's*.

*Id.* at 428.  Similarly, this Court is bound by those prior decisions of the Sixth Circuit.  As the attorney's fee provision is one-sided and acts as a penalty, it is unenforceable.  OmniSource is entitled to summary judgment on this issue.[2]

### H. Allied's Breach of Contract Claim

Both parties have moved in some manner for summary judgment on Allied's claim for breach of contract.  Allied contends that it is entitled to judgment because OmniSource failed to offer any justification for a negative variance and therefore is in breach for not paying amounts consistent with the guaranteed minimum recoveries contained in the Contract.  In response, OmniSource contends that this Court should hold as a matter of law that the ultimate price for the copper, if there is a negative variance, is a "reasonable price at the time of delivery."

Upon review, the Court finds that there exists an issue of fact surrounding whether there was a negative variance that would warrant altering the pricing that was premised upon guaranteed minimum recoveries.  Allied appears to rely on several contractual provisions that are inapplicable to the issue at hand.  First, Allied contends that OmniSource did not timely notify Allied of any alleged problems with the copper recoveries.  However, the Contract only requires notice within 96 hours of any product that does not conform to the Contract.  Again, OmniSource was not claiming that the copper did not conform to the contract.  Rather, it was asserting that there were other substances mixed with the copper, leading to a lower copper recovery than anticipated.  Thus, any reliance on the 96 hour notice provision is misplaced.

Moreover, as detailed above, any reliance on the "as is" provision is also misplaced.

---

[2] To the extent there is any dispute, Allied is correct that OmniSource similarly has no contractual right to recover attorney fees in this matter.

12

Solely the copper was sold as is – other items that were allegedly found within the copper scrap piles were not a part of the parties' contract in any manner. Thus, Allied cannot rely on the "as is" provision.

In short, the parties agreed on pricing that included guaranteed minimum recoveries. In turn, the parties specifically agreed that any negative variance from those recoveries would be resolved between Ramun and Frederick after Frederick provided justification for the variance. The parties, however, sharply dispute whether Frederick provided *sufficient* justification for the variance. On that issue, there is no dispute that Frederick sent emails with attached photographs to Allied that allegedly showed rocks and dirt in the scrap piles. There is further no dispute that Frederick continued to send emails describing the alleged problems on a consistent basis. At the same time, there is no dispute that Frederick did not send the underlying data and tests that supported his allegations that recoveries were lower than anticipated. Based upon those facts, the Court finds that a genuine issue of fact exists surrounding 1) whether the negative variance provision was properly invoked by OmniSource, and 2) whether, if the clause was properly invoked, Allied was unreasonable in its response. These matters must be submitted to a jury.

Finally, OmniSource's motion for summary judgment on this claim need not be addressed at this time. OmniSource is essentially seeking a determination of what the proper price would be in the event that a jury concludes that there was a negative variance. This is an issue that the Court can decide at the time a jury is instructed in this matter. Accordingly, the motions for summary judgment on Allied's claim are DENIED.

### III. Conclusion

For the reasons set forth herein, the Allied's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART, and the OmniSources's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

DATE: September 27, 2012                    */s/ John R. Adams*_____
                                             Judge John R. Adams
                                             UNITED STATES DISTRICT COURT